**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. JOSEPH A. STOCK | ) | |
| | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No.  06 C 448 |
| v. | ) | |
| | ) | HONORABLE DAVID H. COAR |
| ALAN UCHTMAN, Warden, Menard Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Joseph Stock ("Stock" or "Petitioner") is currently serving a sentence of imprisonment pursuant to his conviction for first degree murder in the Illinois courts.  Stock has filed a petition for a writ of habeas corpus (the "Petition") in this Court pursuant to 28 U.S.C. § 2254.[1]  Stock claims that he was denied his Sixth Amendment Confrontation Clause rights when an Illinois trial court limited his cross-examination of State's witness Alfonso Najera ("Najera"). Petitioner's cross-examination of Najera was limited when the trial court prevented him from confronting Najera at trial with a transcript of a recorded telephone conversation that had previously taken place between Najera and Petitioner.  The Petition has been fully briefed and is before the court.  For the reasons stated below, the Petition is respectfully denied.

## I.  BACKGROUND

---

[1] Alan Uchtman, the Respondent named in the Petition, is no longer the warden at Menard Correctional Center, the facility where Petitioner Stock is incarcerated.  (*See* D.E. 23 at 1 n. 1.)  Donald Gaetz is now the warden there, and should be substituted as the proper Respondent.  *See Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) ("[T]he proper respondent is the warden of the facility where the prisoner is being held . . . .") (citing, *inter alia*, *Hogan v. Hanks*, 97 F.3d 189, 190 (7th Cir. 1996)).

## A. Introduction[2]

Petitioner is incarcerated at the Menard Correctional Center in the custody of warden Donald Gaetz. Petitioner is imprisoned pursuant to his conviction for first-degree murder, for which he was sentence to ninety years imprisonment. Docket Entry 1 at 1 (because of the large number of filings in this petition, documents are cited by docket entry number, hereinafter "D.E.").

Petitioner's trial concerned events that occurred on, and subsequent to, June 20, 1997, the day on which Connie Wagner ("Ms. Wagner") was found murdered in her Palatine, Illinois home. D.E. 1 at 8. Ms. Wagner's wrists had been tied with a telephone cord, and she had been stabbed over 180 times. D.E. 23 at 23. Ms. Wagner and Petitioner had dated for a few months prior to that day, but by June 1997 the relationship had deteriorated. D.E. 24, Ex. C at 2. On the evening before the murder, Ms. Wagner told Petitioner that she was moving to Texas. *Id.* Petitioner became angry and told Ms. Wagner that she would never make it to Texas. *Id.* On June 24, 1997, Petitioner called his friend Alfonso Najera ("Najera") and told him that he had killed Ms. Wagner because he was angry at her. *Id.*

At trial, the State argued that Petitioner copied Ms. Wagner's keys in order to gain entry to the house, killed Ms. Wagner, took clothes from Ms. Wagner's brother, and finally, took Ms. Wagner's car, as was evidenced by the presence of Petitioner's fingerprints inside the car when it was found later. D.E. 23 at 23. The State called Najera, who testified that Petitioner described murdering her by making stabbing motions. D.E. 23, Ex. C at 4. Najera also testified that Petitioner confessed to Ms. Wagner's murder when they spoke four days after the killing. D.E. 1 at 8; D.E. 23 at 7.

---

[2] Facts regarding the crime are taken from the Illinois Appellate Court's opinion reviewing the jury verdict, unless otherwise indicated. The Court presumes the factual findings of the Illinois courts to be correct. *See* 28 U.S.C. § 2254(e)(1); *Ashford v. Gilmore*, 167 F.3d 1130, 1131 (7th Cir. 1999).

Petitioner remained silent at trial. D.E. 23, Ex. C at 2. However, Petitioner offered evidence that the day after the murder, he cooperated with the police and that the clothing he was wearing the day of the murder, which he gave to the police, tested negative for blood. *Id.* In terms of physical evidence, expert testimony established that the hair found under the victim's fingernail did not belong to Petitioner and that there were no signs the hair had been removed by force. *Id.* Petitioner's fingerprints were not found at the crime scene, *id.* at 3, nor were there any scratches or signs of struggle on Petitioner's body. *Id.* at 4. It was not disputed that in the months before the murder, the victim was spending large amounts of money on drugs and was in debt to her suppliers. *Id.* at 4-5.

Stock was convicted in the Circuit Court of Cook County of first-degree murder and sentenced to ninety years' imprisonment. D.E. 23 at 1.

### B. Najera's Role During Investigation and Trial

Petitioner claims that "the State's case rested entirely on the testimony of Najera." D.E. 44 at 3. Indeed, in its Motion to Set a Trial Date, the State made clear that "[w]ithout [Najera's] testimony the State cannot go forward." *Id.*

Najera had not immediately gone to the police with information about Petitioner's supposed confession; rather, the police spoke with Najera from June to September 1997, and on September 4, 1997, Najera voluntarily visited the police station for several hours. D.E. 23, Ex. C at 4. While there, Najera signed a statement, written by a prosecutor, which contained statements Najera said Petitioner made about the murder. *Id.* at 4. The police then planned, with Najera's consent, to tape a telephone conversation between Najera and Petitioner, during which Najera agreed that he would attempt to get Petitioner to reveal his confession. *Id.* at 5-6. During

the taped conversation, Najera did not directly mention the confession, but he made reference to it.[3]  *Id.* at 6.  The crux of the dispute was the following exchange between Stock and Najera:

> [Petitioner]: I mean shit—you still believe me, don't you?
> [Najera]: Yeah, I believe you, dude.  I believe you, man.  I just want to make sure that you didn't say something to anybody else and they come to court and then.
> [Petitioner]: That what?

---

[3] Petitioner also made exculpatory statements that Najera failed to contradict, for example:

> [Petitioner]:  It's a bunch of shit man. They ain't got nothing.  I didn't do nothing—you know that.
> [Najera]: Yeah I know.
> [Petitioner]: It's a bunch of shit.  You know and I know that—what do you call it?—my ass would have been in jail a long time if I was guilty. You know what I'm saying.
> [Najera]: It's just bullshit, man, you know.  I got to miss work and shit.

D.E. 23, Ex. C at 6.  Similarly, a few minutes later in the conversation, the following exchange occurred:

> [Petitioner]:  . . . All it comes down to is you know and I know I didn't do this.  You know and I know that I don't know who did or have any knowledge about the whole damn thing and they just want to make a bust on somebody to make themselves look good.  You know.  All they're going to try to do is intimidate you and all that kind of bullshit [phone cuts out for a second or two].
> [Najera]: Hello.
> [Petitioner]: You know?
> [Najera]: Yeah.

*Id.* at 6-7.  At times, Petitioner specifically stated that he did not commit the murder and Najera failed to say anything regarding Petitioner's previous contrary confession. For example:

> [Petitioner]: . . . But then that is going to turn into a while another thing because first off you'd be lying if you said what do you call it, any kind of negative thing regarding me— you know what I mean.  Because I didn't do nothing and I don't know who did.  So.
> [Najera]: Hey man, I got to get back to work dude.
> [Petitioner]: And look at it that way.  It's been over a year.  I haven't run.  I got nothing to run from.  I didn't move.  I didn't all of sudden disappear.  You know what I mean?  If I was guilty, my ass would have took off.  And I'm just sitting here waiting for them to find out what the deal is, cause I want to know who's responsible myself. Do you think I don't want to know.  That's it.
> [Najera]: Well I have to get back to business you know.

*Id.*

[Najera]: You didn't tell anybody else—you know what I'm saying? Cause they come to court and then I look like, you know.
[Petitioner]: Tell anybody what?

D.E. 44 at 22; *see also* D.E. 23, Ex. F at 428-433.

Prior to trial, the State filed a motion *in limine* arguing that the taped conversation between Mr. Najera and Petitioner was inadmissible hearsay and thus should be barred at trial. D.E. 1 at 9; D.E. 23 at 9; D.E. 44 at 2; *see also* D.E. 24, Ex. A at C-189. The parties argued the motion extensively. D.E. 23 at 9; D.E. 44 at 2. The State argued that its motion was supported by "well established Illinois evidentiary rules [which] provide that 'self-serving statements by an accused are inadmissible hearsay.'" D.E. 23 at 9 (citing *People v. Patterson*, 610 N.E.2d 16, 33 (Ill. 1992)). Petitioner argued that Najera's failure to directly mention the supposed previous confession during the taped conversation as well has his affirmation of Petitioner's exclamations of innocence were important impeachment evidence. D.E. 23 at 9. Petitioner contended that the "exchanges between Stock and Najera on that tape were not hearsay because the statements were not offered for their truth, but rather to impeach Najera by omission and by showing his failure to confirm that a confession took place when presented the opportunity to do so." D.E. 44 at 2; *see also* D.E. 1 at 9.

The trial judge granted the State's motion *in limine* to bar the tape evidence, ruling that Petitioner's statements in the phone conversation were "clearly hearsay" and thus inadmissible. D.E. 1 at 9; D.E. 23 at 9 (citing D.E. 23, Ex. F at 127); D.E. 44 at 2. In making its ruling, the trial court noted that Petitioner's argument—that the evidence was to be offered to impeach, and that thus was not hearsay—was "a good legal argument . . . [but was] not founded in any of the cases." D.E. 23, Ex. F at 128. However, the court stated that, despite this ruling, it would "allow counsel on cross examination of [Najera] to ask questions about a subsequent conversation with

the defendant, and the fact that he never brought up the fact to the defendant that [the defendant] previously confessed on a specific date." D.E. 23, Ex. F at 129; *see also* D.E. 23 at 10. The judge continued that "[i]f Najera, in my opinion, opens the door by denying that he did not confront the defendant about a previous statement, then I believe . . . that [the] sum and substance of that transmission becomes relevant for purposes of impeachment." D.E. 23, Ex. F at 129; *see also* D.E. 23 at 10. However, the court ruled that Petitioner could not impeach Najera with "the actual [taped] conversation" alone because it was "pure hearsay, and in [the court's] opinion, it is a prior consistent statement [by the Petitioner]." D.E. 23 at 10 (citing D.E. 23, Ex. F at 129).

During trial, but before Najera took the stand, prosecutors told the trial judge that Najera would claim that during the taped conversation with Petitioner, he had attempted to bring up Petitioner's confession. D.E. 44 at 21. Specifically, the State argued that when Najera asked Stock if he had "told anyone else," he was referencing the previous confession. D.E. 23, Ex. F at C256-57. Accordingly, the State filed a "Motion to Clarify the Court's Ruling Concerning the Admission of Any Evidence Surrounding the COH Tape." *See id.* During the debate over the Motion to Clarify, the judge seemed willing to admit Najera's "tell anybody else" statement from the tape during re-direct if the defendant attempted, in his cross-examination, to impeach Najera by implying that he had never brought up the previous confession. D.E. 44 at 21-22. Defense counsel then argued that Petitioner should be allowed to bring in Stock's exculpatory "tell anybody what" response to Najera's statement on re-cross. *Id.* at 21-22 (citing D.E. 23, Ex. F at 434-35).

The trial judge ruled that defense counsel could not bring in Stock's exculpatory "tell anybody what" response. D.E. 44 at 22. To summarize, the trial court indicated that it would

allow the prosecution to show that Najera had referenced the previous confession by introducing Najera's statement that "You didn't tell anybody else," but would not allow the defense to show that Petitioner then said: "Tell anybody what?"  The trial court stated that those words ("Tell anybody what?") were "just as exculpatory" as other excluded portions of the tapes and thus inadmissible.  D.E. 44 at 21 (citing D.E. 23, Ex. F at 435).

Petitioner describes his dilemma following this ruling:

> The Court here ruled that Petitioner could confront Najera with the assertion that, after having been told by police to specifically bring up the confession Najera claimed to have heard, the failed to do so.  But, when Najera disputes [defense] counsel's assertion, the State could then bring in the "tell anybody else" comments.  Petitioner, however, could not thereafter remind Najera of [Petitioner's] "tell anybody *what*" reply, to which Najera did not directly respond.

D.E. 44 at 21 (emphasis in original) (citing D.E. 23, Ex. F at 436).  In effect, Petitioner argues that while he was given an avenue by which to cross-examine Najera and potentially bring in the recorded conversation, this avenue "would have done damage to [Petitioner's] case while [providing] no benefit in return."  D.E. 44 at 23.

In the end, Petitioner cross-examined Najera extensively, but chose not to bring up Najera's failure to mention Petitioner's previous confession in the taped conversations.  *See* D.E. 23 at 10-12.

### C.  State Appellate Proceedings

Petitioner raised five claims to the Illinois Court of Appeals, including the Confrontation Clause issue.  D.E. 1 at 2.  With respect to that issue, the Illinois Court of Appeals held that the trial court's limitation of the impeachment of Mr. Najera was not an abuse of discretion.  D.E. 23 at 12; D.E. 23, Ex. C at 6-10, 12.  The appellate court began by quoting portions of the transcript of the recorded conversation and noting that Petitioner sought to use Petitioner's exculpatory statements on the tapes to lay a foundation to impeach Mr. Najera by omission because Mr.

Najera had failed to mention Petitioner's prior confession during the taped conversation or contradict Petitioner's denials of guilt.

The appellate court began its analysis by recognizing that the Sixth and Fourteenth Amendments of the United States Constitution guaranteed a defendant's right to confront the witnesses against him. D.E. 23, Ex. C at 5. After recounting the parties' arguments regarding which statements of Najera should have been included or excluded, the court discussed the Illinois evidentiary rule that "self serving statements by an accused are inadmissible hearsay." *See* D.E. 23, Ex. C at 8 (citing *People v. Hosty*, 497 N.E.2d 334, 339 (Ill. App. Ct. 1986)).[4] The Court also discussed the fact that the trial court "painstakingly considered the arguments and case law" and noted the broad discretion afforded to trial judges in determining admissibility under Illinois law. *See* D.E. 23, Ex. C at 9 ("Admissibility of evidence is a matter of discretion and a trial judge's evidentiary ruling will not be reversed absent an abuse of discretion.") The Illinois Appellate Court's lone statement concerning federal constitutional law—other than the court's invocation of the Sixth and Fourteenth Amendments more generally—was its quotation of *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) for the proposition that the "Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *See* D.E. 23, Ex. C at 9 (emphasis in *Fensterer*).

---

[4] In *Hosty*, the defendant wanted to impeach a witness with a recorded phone conversation during which the defendant made exculpatory statements. 497 N.E.2d at 339. The Court of Appeals noted that the trial judge's exclusion of the taped conversations was sound because it was not clear that the "defendant's sole aim in questioning [the witness] about the tape recordings was to impeach [the witness's] credibility." *See Hosty*, 497 N.E.2d at 339. Rather, the defendant's emphasis in *Hosty* "on the allegedly exculpatory nature of the two statements he believes should have been admitted evidences a focus on the content of what he said in the conversations." *See Hosty*, 497 N.E.2d at 339; D.E. 23, Ex. C at 8-9.

The appellate court concluded that, based on its review of the record, the trial judge did not abuse his discretion in limiting Najera's impeachment. The appellate court added that Najera's cross-examination had been "extensive," and had included 46 pages of cross-examination followed by six-pages of re-cross-examination. D.E. 23, Ex. C at 9. Finally, the court held, in the alternative, that limiting Petitioner's impeachment by omission of Najera, "if error, was harmless beyond a reasonable doubt." D.E. 23, Ex. C at 9.

Petitioner's conviction and sentence was affirmed on June 20, 2004. D.E. 1 at 2. Following the affirmance of his conviction and sentence in the Illinois Court of Appeals, Petitioner raised the Confrontation Clause issue in a Petitioner for Leave to Appeal to the Illinois Supreme Court. D.E. 1 at 2; D.E. 9 at 23 ¶ 4. The Illinois Supreme Court denied the Petition for Leave to Appeal on January 26, 2004. D.E. 1 at 2; D.E. 23 ¶ 4.

## II. Legal Principles

### A. Authority to Grant a Writ of Habeas Corpus and Standard of Review

#### 1. General Principles

"A district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the grounds that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In that regard, the Supreme Court has recognized a "presumption that state courts know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Section 2254(d) of Title 28 of the United States Code ("Section 2254(d)") demands that state-court decisions be given the benefit of the doubt." *Id.*, 537 U.S. at 24. "[I]t seems clear that Congress intended federal judges to attend with the utmost care to state-court decisions, before concluding that those

proceedings were infected by constitutional error sufficiently serious to warrant the issuance of the writ." *Williams v. Taylor*, 529 U.S. 362, 386 (2000).

The decision in this case is governed by the standards established in Section 2254(d) as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Precedent teaches that "[t]he writ is not easy to come by—section 2254 authorizes issue of the writ only if the challenged decision of the state court 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' . . . or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding'." *Woods v. McBride*, 430 F.3d 813, 816 (7th Cir. 2005) (quoting Section 2254(d)(1); Section 2254(d)(2)).

"The statutory phrase 'clearly established Federal law as determined by the Supreme Court of the United States,' is a critical limitation under § 2254(d)(1) and refers to 'the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state court decision.'" *Washington v. Smith*, 219 F.3d 620, 627 (7th Cir. 2000) (citing Section 2254(d)(1)); *Williams*, 529 U.S. at 412. In addition, "although they will often overlap, the phrases 'contrary to' and 'unreasonable application of' have independent meaning." *Washington*, 219 F.3d at 628 (citing *Williams*, 529 U.S. at 362).

## 2. The "Contrary to" Clause

Under the "contrary to" clause of Section 2254(d), a state court's decision is subject to *de novo* review. *Anderson v. Cowan*, 227 F.3d 893, 896 (7th Cir. 2000) (citing *Schaff v. Snyder*, 190 F.3d 513, 522 (7th Cir. 1999)). "A decision is contrary to clearly established law if the state court applied a rule that contradicted the governing law as set forth in Supreme Court cases, or if, being confronted with a set of facts materially indistinguishable from those examined by

Supreme Court precedent, the state court arrives at an opposite result." *Williams v. Bartow*, 481 F.3d 492, 498 (7th Cir. 2007) (citation omitted); *accord Woods*, 430 at 816; *Washington*, 219 F.3d at 628.

In *Williams v. Taylor*, the Supreme Court made clear that a "run-of-the-mill state court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)'s 'contrary to' clause." *Id.*, 529 U.S. at 406. "If the state court applied the proper rule, yet reached a conclusion that the federal habeas court would not have independently reached, the federal court *cannot* grant the writ based on the 'contrary to' clause." *Washington*, 219 F.3d at 628 (citing *Williams*, 120 S.Ct. at 1520). Finally, in order for the state court's decision to be considered "contrary to" clearly established Federal law as established by the United States Supreme Court, that state court's decision must be "substantially different from relevant [Supreme Court] precedent." *Id.*, 219 F.3d at 628 (citing *Williams*, 529 U.S. at 405).

### 3. The "Unreasonable Application of" Clause

Under the "unreasonable application of" clause of Section 2254(d), the Court defers to "a reasonable state court decision." *Anderson*, 227 F.3d at 896-97. When a state court decision unreasonably applies the law of the Supreme Court to the facts of a prisoner's case, a federal court applying Section 2254(d) may conclude that the state court decision falls within that provisions "unreasonable application of" clause. *Williams*, 529 U.S. at 409. In this regard, the Supreme Court has repeatedly instructed that an unreasonable application of federal law is something more than simply an application that the habeas court might not have reached in the first instance or that the habeas court thinks is simply incorrect. Specifically, a "federal habeas court may not issue the writ simply because the court concludes in its independent judgment that

the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 410.

The question of whether a clear Supreme Court precedent was correctly applied "requires us to ask, as the Supreme Court held in *Williams*, 'whether the state court's application of clearly established federal law was objectively unreasonable.'" *Raygoza v. Hulick*, 474 F.3d 958, 963 (7th Cir. 2007) (citing *Williams*, 529 U.S. at 409). Moreover, "to be unreasonable is more than to be incorrect in some absolute sense of the term. It means instead a conclusion 'lying well outside the boundaries of permissible difference of opinion.'" *Raygoza*, 474 F.3d at 963 (citing *Hardaway v. Young*, 302 F.3d 757 (7th Cir. 2002)).

A state court decision unreasonably applies clearly established law if "the state court identifies the correct rule and unreasonably applies it to the facts, or if the state court unreasonably extends, or refuses to extend, a rule of law." *Bartow*, 481 F.3d at 498 (citing *Williams*, 529 U.S. at 407-08). "To draw the line between reasonable errors, which will stand in federal habeas review, and unreasonable ones, upon which we shall grant the writ, we must distinguish between those decision 'which comport with recognize conventions of legal reasoning,' and those which '[l]ie well outside the boundaries of permissible differences of opinion." *Bartow*, 481 F.3d at 498 (7th Cir. 2007) (citing *Ward v. Sternes*, 334 F.3d 696, 703 (7th Cir. 2003); *Hardaway*, 302 F.3d at 762. In sum, in order to "trigger grant of the writ, the state court decision must be both incorrect and unreasonable." *Woods*, 430 F.3d at 817 (citation omitted). In this "deferential and limited review, state court factual findings are presumed correct. A habeas petitioner bears the burden of rebutting that presumption by clear and convincing evidence." *Bartow*, 481 F.3d at 498 (citing 28 U.S.C. § 2254(e)(1)).

**B. Threshold Procedural Requirements**

## 1. Exhaustion

A court cannot grant a writ of habeas corpus unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(4). The exhaustion requirement means that "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). The Supreme Court has pointed out that, whether or not the Illinois Supreme Court exercises its discretion to grant a petition for leave to appeal, "a petition for discretionary review in Illinois's Supreme Court is a normal, simple, and established part of the State's appellate review process." *Id.* at 845. As a result, Illinois habeas petitioners must present their claims to the Illinois Supreme Court in order to meet the exhaustion requirement. *Id.*

## 2. Procedural Default

Petitioner also may only present claims for relief that are not procedurally defaulted. A claim can be procedurally defaulted in several ways. First, if a judgment by a state court "rests on a state law ground that is independent of the federal question and adequate to support the judgment," then the Court cannot review a question of federal law. *Colement v. Thompson*, 501 U.S. 722m 729 (1991). This default bar applies even if the state law ground is procedural rather than substantive. *See id.* The underlying reason for this procedural default bar is "grounded in concerns of comity and federalism." *Id.* at 730. Habeas review is only available for violations of federal law. If this procedural default bar were not in place, "habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the

limits of [a federal court's] jurisdiction and a means to undermine the State's interest in enforcing its laws." *Id.* at 730-31.

Second, a claim maybe procedurally defaulted if it was not presented for a full round of review in Illinois's appellate system. This can occur when a petitioner has failed to present in a timely manner claims in a round of appellate review. *See O'Sullivan*, 526 U.S. at 848. A failure to timely present a claim in a round of appellate review can occur when it was not presented to any state court, *e.g. Johnson v. Sternes*, No. 03 C 5110, 2004 WL 527117, at *4 (N.D. Ill. March 10, 2004), or when a claim was presented to the Illinois Court of Appeals but not to the Supreme Court of Illinois. *See, e.g.*, *Rittenhouse v. Battles*, 263 F.3d 689, 697 (7th Cir. 2001) ("[T]his claim has been procedurally defaulted because [Petitioner] did not include it in his petition for leave to appeal to the Illinois Supreme Court.").

## C. Harmless Error

Finally, a habeas petitioner may not obtain the writ if the state court's error is harmless. *Aleman v. Sternes*, 320 F.3d 687, 690 (7th Cir. 2003). "Nothing in the AEDPA suggests that it is appropriate to issue writs of habeas corpus even though any error of federal law that may have occurred did not affect the outcome." *Id.* In *Brecht v. Abrahmson*, the Supreme Court made clear that "[t]he *Kotteakos* harmless-error standard is better tailored to the nature and purpose of collateral review than the *Chapman* standard, and the application of a less onerous harmless-error standard on habeas promotes the considerations underlying our habeas jurisprudence." *Brecht*, 507 U.S. at 632 (referencing *Kotteakos v. United*, 328 U.S. 750 (1946)). As a result, the standard for determining whether habeas relief should be granted is whether the error in the state court "had substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 623 (quoting *Kotteakos*, 328 U.S. at 776), rather than whether the error was

"harmless beyond a reasonable doubt," *Brecht*, 507 U.S. at 623 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1976)). When considering habeas relief, only when the former standard is met is the state court error harmful, and only when the state court error is harmful should the writ be granted.

## III. DISCUSSION

### A. Petitioner Has Satisfied the Threshold Procedural Requirements

Neither party disputes that the Confrontation Clause argument has been properly presented to and exhausted before the Illinois courts. Petitioner's Confrontation Clause argument was heard and rejected by both the Circuit Court of Cook County and the Illinois Court of Appeals, and was raised in a Petition for Leave to Appeal before the Illinois Supreme Court, which was denied. D.E. 23 ¶ 6; D.E. 44 at 6. After these proceedings, Petitioner filed a petition for writ of habeas corpus in this Court, raising the Confrontation Clause issue. D.E. 1 at 5. The Court agrees with the parties that the Confrontation Clause issue is properly before this Court.

### B. Merits Analysis

Petitioner argues that the Illinois Appellate Court's ruling was an unreasonable application of the Supreme Court's Confrontation Clause jurisprudence because, "while the court correctly identified the governing Confrontation Clause precedent, it unreasonably equated the *extensiveness* of the cross-examination with the *effectiveness* of the cross-examination." D.E. 44 at 6.

As stated above, under AEDPA, a writ of habeas corpus may not be issued unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §

2254. In this case, the parties agree that the state appellate court correctly identified the general principle governing this case: that a defendant has a constitutional right to confront the witnesses against him. *See* D.E. 23, Ex. C at 5, 9 (state appellate court opinion citing the Sixth Amendment of the Constitution and *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)); D.E. 44 at 4-5 (Petitioner stating that the appellate court "correctly identified the standard governing Confrontation Clause" cases). Because the state court identified the appropriate rule, its decision cannot be said to be "contrary to" established federal law. *See Washington*, 219 F.3d at 628. The issue, then, is whether the state court unreasonably applied clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). When, as here, a case falls under the unreasonable application prong, it involves a mixed question of law and fact, and the federal court must defer to a reasonable state decision.

Supreme Court authority teaches that the Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal case "to be confronted with the witnesses against him." *Delaware v. Van Ardsall*, 475 U.S. 673, 678 (1986). That right is secured to defendants in state as well as in federal proceedings. *Pointer v. Texas*, 380 U.S. 400, 403 (1965). Confrontation Clause cases generally fall into two broad categories: (1) cases involving a trial court's admission of out-of-court statements, and (2) cases involving restrictions imposed by law or by the trial court on the scope of cross examination. *See Fensterer*, 474 U.S. at 18. Petitioner's case falls into the latter category, as Stock claims that his constitutional rights were denied when the trial court did not allow Petitioner to impeach Najera with a portion of the taped conversation. D.E. 1 at 5; D.E. 44 at 5-6.

The relevant Supreme Court precedent is found in *Davis v. Alaska*, 415 U.S. 308, 318 (1974) and *Chambers v. Mississippi*, 410 U.S. 284 (1973). *See Dunlap v. Hepp*, 436 F.3d 739,

742 (7th Cir. 2006) (recognizing, in a habeas case involving a trial court's limits on cross-examination under the hearsay rule, that *Davis* and *Chambers* were the relevant precedents). In *Davis*, a missing safe was found about twenty-six miles outside of Anchorage near the home of Jess Straight. *Id.* at 309. Straight's minor stepson, Richard Green, told state troopers that he had spoken with two men standing by a car near where the safe was discovered. *Id.* Green later picked the defendant out of a photo array and a line-up as one of the men that he had seen by the car. At trial, Green was a crucial witness for the prosecution. *Id.* Green had a juvenile criminal record and was on parole at the time the safe was found, but prior to trial, the State moved for a protective order to prevent any mention Green's criminal record. *Id.* at 310-11. Defense counsel opposed the protective order, wishing to introduce Green's juvenile record to show that Green might have identified Davis to shift suspicion away from himself and to demonstrate that, in making the identification, Green might have been concerned about jeopardizing his own freedom as a parolee. *Id.* at 311. The trial court granted the prosecution's motion for the protective order, relying on Alaska Rule of Children's Procedure 23, which directed that juvenile dispositions not be admissible evidence in judicial proceedings. *Id.* Although defense counsel was able to elicit from Green that it has crossed his mind that the police might consider him a suspect, counsel was not allowed to make a record regarding the reasons for the police's possible suspicion, *i.e.*, Green's juvenile record. *Id.* at 312, 314-15.

The Supreme Court reversed the trial court's decision granting the protective order on Confrontation Clause grounds. *Id.* at 320-21. It found that the "accuracy and truthfulness of Green's testimony were key elements in the State's case" and that "[t]he claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of Green's vulnerable status as a probationer." *Id.* at 317-18. While the Court

recognized that the State had an interest in preserving the anonymity of juvenile offenders, *see id.* at 319, the Court concluded that "the right of confrontation is paramount" to this interest, and that "[w]hatever temporary embarrassment might result to Green or his family by disclosure of his juvenile record . . . is outweighed by petitioner's right to probe into the influence of possible bias in the testimony of a crucial identification witness." *Id.* The trial court had allowed some cross examination of Green, but it did not permit defense counsel to "expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Id.* at 315. The decision of the trial court was reversed and remanded for further proceedings. *Id.* at 320-21.

In *Chambers*, the Supreme Court considered a case in which the defendant's Confrontation Clause rights were in tension with the hearsay rule. 410 U.S. 284 (1973). The defendant was accused of murdering a police officer during a shoot-out in a crowd. At trial, one of Chambers's defenses was that another man in the crowd, Gable McDonald, had killed the officer. *Id.* at 289-90. However, Chambers's presentation of this defense was impeded by a Mississippi rule of evidence prohibiting a party from impeaching his own witness as well as by the rule against hearsay. *Id.* The trial court did not allow Chambers to cross-examine McDonald and also refused to allow Chambers to call three witnesses to whom McDonald had allegedly confessed he was the shooter. *Id.* at 294. The Supreme Court ultimately reversed the Mississippi trial court, stating that in these circumstances, "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.* at 302. However, the Court also took care to note that its conclusion was compelled by the specific facts of the case and that it did not wish to

"signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." *Id.*

Though both *Davis* and *Chambers* are highly fact-specific decisions, they instruct that under certain circumstances—e.g., when the determination of a defendant's guilt is integrally tied to a key witness's credibility—evidentiary rules must yield to allow for effective cross-examination. However, such guidance must be balance against other Supreme Court teachings, which caution that "[i]t does not follow . . . that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on the defense counsel's inquiry into the potential bias of a prosecution witness." *Van Arsdall*, 475 U.S. at 679. Rather, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Id.* As the Supreme Court noted in *Fensterer*, "the Confrontation Clause guarantees an *opportunity* for cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." 474 U.S. at 20.

The Court finds the initial inquiry—as to whether the trial court's rulings on Najera's cross-examination were error—to be rather subtle. The trial court ruled pre-trial that the defense could not introduce the tape or its transcription. D.E. 44 at 19. The court qualified that ruling at the time, however, stating that in cross-examining Najera, defense counsel could ask Najera why he never, as instructed by the police, brought up the previous confession in the taped phone call. D.E. 44 at 19.[5]

---

[5] Specifically, the trial court judge stated, "If the witness, in my opinion, opens the door by denying that he did not confront the defendant about a previous statement, then I believe now

During trial, but before Najera testified, the state moved to clarify the trial court's ruling concerning the admission of any evidence surrounding the tape. D.E. 44 at 20. In its motion, and during oral argument regarding the motion, the State asserted that "the witness [Najera] did confront the defendant about a previous statement to the best of the witness's ability." D.E. 23, Ex. A at C256. Indeed, during the taped conversations, although Najera did not directly mention the confession, he made reference to it. *See supra* Section I.B. The State argued that when Najera asked Stock if he had "told anybody else," Najera was implying that Stock had told Najera previously of his guilt. D.E. 23, Ex. A at C257. As the State put it in its Motion to Clarify: "[A] [r]easonable fact finder could believe that when party A asks party B 'have you told someone else?' it is presumed that party B has previously shared information with party A." *See* D.E. 23, Ex. A at C257. The State therefore argued that Stock's counsel could not successfully impeach Najera by omission. *Id.*

In oral argument regarding the motion to clarify, Petitioner's counsel stated that the "tell anybody what" sequence was "all [Petitioner's counsel] was interested in" with regard to counsel's impeachment by omission. D.E. 23, Ex. A at 432. With regard to that exchange, Stock's counsel "agree[d] with [the State's] counsel that [the passage] indeed [was] a suggestion that Stock had previously confessed," but argued that Stock's response to Najera's oblique reference—i.e., Stock's question, "Tell anybody what?"—should be included in any cross-examination. D.E. 23, Ex. F at 432.

The trial court was unconvinced. D.E. 23, Ex. F at 436-38. The court ruled that if defense counsel cross-examined Najera regarding why he never brought up the previous confession, the State, on redirect, could bring up the fact that Najera had asked Petitioner, in the

---

that the sum and substance of that transmission becomes relevant for purposes of impeachment." D.E. 23, Ex. A at 256.

taped conversation, if Petitioner had "told anybody else." D.E. 23, Ex. F at 435-36. However,

Petitioner's counsel could not then question Najera regarding Stock's subsequent "tell anybody

what" response. D.E. 23, Ex. F at 436. Although the trial court acknowledged that Petitioner

had a right to confront witnesses against him, the court ruled that Petitioner's "tell anybody

what" statement was inadmissible because it was exculpatory under Illinois evidentiary rules and

also because it was hearsay. D.E. 23, Ex. F at 435-37. Upon hearing the trial court's ruling on

this matter, Petitioner's counsel stated that he would avoid the line of questioning in its

entirety—that is, that he would not ask Mr. Najera why he never brought up the confession. D.E.

23, Ex. F at 436.

Hearsay is a "statement, other than one made by the declarant while testifying at trial or

hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). The

hearsay rule, which has long been recognized in federal and state courts, is "grounded in the

notion that untrustworthy evidence should not be presented to the triers of fact." *Chambers*, 410

U.S. at 298. "Out of court statements are traditionally excluded because they lack the

conventional indicia of reliability: they are usually not made under oath or other circumstances

that impress the speaker with the solemnity of his statements; the declarant's word is not subject

to cross-examination; and he is not available in order that his demeanor and credibility may be

assessed by the jury." *Id.* (citing *California v. Green*, 399 U.S. 149, 158 (1970)). However, as

noted in the Court's discussion of *Chambers*, "where constitutional rights directly affecting the

ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to

defeat the ends of justice." *Chambers*, 410 U.S. at 302.

Of course, as the hearsay rule indicates, if an out of court statement is being used not for

the truth of the matter asserted, but rather, among other things, to properly impeach a witness's

credibility, it may be admissible. Petitioner claims that he wished to impeach Najera by omission. Impeachment by omission is a "well-established, if slightly uncommon, subcategory of impeachment by contradiction. The theory of impeachment by omission is that 'if [a] former statement fails to mention a material circumstance presently testified to, which it would have been natural to mention in the prior statement, the prior statement is sufficiently inconsistent' to be admitted to impeach the present testimony." *Moylan v. Meadow Club, Inc.*, 979 F.2d 1246, 1249 (7th Cir. 1992) (quoting 1 John W. Strong, McCormick on Evidence § 34 at 114-15 (4th ed. 1992)) (other citations omitted).

In this case, it does not appear to the Court that the trial judge applied the hearsay rule "mechanistically" or without giving significant consideration to Petitioner's legal arguments. From the record, it appears that the Illinois trial court understood the issue and defense counsel's argument on behalf of admitting the portion of the tape in question, and acted within its discretion when it excluded Stock's statement. It was not clear whether Najera's statements on the phone could be applied to an impeachment by omission theory. On the one hand, it is possible that jurors would have found Najera's oblique reference to the previous confession (i.e., to "tell[ing] anybody else" or confessing the murder to another person) to be impeaching. On the other hand, it is also possible that the trial court did not find that it "would have been natural" for Najera to bring up the confession more bluntly, setting the stage for an impeachment by omission. *See Moylan*, 979 F.2d at 1249 (describing the circumstances in which an impeachment by omission would be proper). After all, at that time, Najera understood Stock to be a cold-blooded murderer, and Najera may simple not have wanted to provoke him. Najera's failure to bring up the confession directly could then be attributed to his apprehension, rather than his inconsistency.

The judge may also have decided that admission of Stock's exculpatory statement would have risked the jury taking that statement as evidence of Stock's innocence, rather than as "impeachment by omission" of Najera, a rather subtle distinction under the circumstances. Certainly, it would have helped Stock's case to point out those portions of the transcript where Petitioner actively denied committing the crime and Najera failed to contradict him. However, the trial judge believed those statements to be merely statements of innocence on Stock's part and thus inadmissible prior consistent statements. While it is a close call, the court's ruling was not clearly incorrect and was not unreasonable.

Nor did *Davis* or *Chambers* compel the admission of Stock's exculpatory statement on the tape. In *Davis*, the Court determined that the defendant's Confrontation Clause rights outweighed interest in enforcing the Alaska rule shielding minors from disclosure of juvenile records. In *Chambers*, the Court ruled that the defendant's right to confront witnesses was paramount to a Mississippi evidentiary rule preventing a party from impeaching its own witness as well as to hearsay concerns. In both cases, however, the Supreme Court reversed decisions in which the limits on cross-examination compromised the truth-seeking function of the trials: in *Davis*, by preventing the defendant from inquiring into the witness's motivation to lie, and in *Chambers*, by preventing the defendant from pointing to a very plausible alternative culprit. *See Davis*, 415 U.S. at 310-21; *Chambers*, 410 U.S. at 294. Here, in contrast, the limits on cross-examination did not prevent Stock from pointing out a witness's motivation to lie or pointing out another suspect, and the limits certainly did not seem to have compromise the trial outright. Rather, the limits on cross-examination here preventing Stock from bringing his own statements of innocence, to which, he argues, he should have received more strenuous objection from Najera. The Court is not persuaded that such a concern must override the countervailing

interests in maintaining Illinois evidentiary and hearsay rules, and cannot say that the Illinois

court erred it its decision to exclude the statements. If Stock had taken the stand, he could have

testified regarding the conversation himself. He chose not to, as was his right, but the trial court

was within its discretion to also exclude his exculpatory statements.

### C. Unreasonable Application

Even if this Court found that the Illinois courts were in error with regard to the limits put

on Najera's cross-examination, error is not necessarily enough to warrant the issuance of the writ

of habeas corpus. Rather, the error must be an "unreasonable" application of Supreme Court

precedent. *See Williams*, 529 U.S. at 410. ("[A]n unreasonable application of federal law is

different from an *incorrect* application of federal law.") As the Seventh Circuit has recently

stated in the habeas context, "being unwise is not the same thing as being unconstitutional."

*Tolliver*, 470 F.3d at 1208 (denying the writ because the state appellate court's finding—that the

limitations on the petitioner's ability to cross-examine a state witness were not in error—could

not be "said to be an unreasonable application of Supreme Court precedent"). To be considered

"unreasonable," a state court's decision must lie "well outside the boundaries of permissible

differences of opinion." *Woods*, 430 F.3d at 816-17 (quoting *Hardaway*, 302 F.3d at 762);

*Hubanks v. Frank*, 392 F.3d 926, 929 (7th Cir. 2004) (state court outcome is reasonable if

decision is "one of several equally plausible outcomes") (internal quotation marks and citations

omitted). If the state court decision is "at least minimally consistent with the fact and

circumstances of the case" it is considered reasonable for the purposes of habeas review. *See*

*Dunlap*, 436 F.3d at 745 (quoting *Hammer v. Karlen*, 342 F.3d 807, 810 (7th Cir. 2003)).

Moreover, the Seventh Circuit has specifically recognized that in Confrontation Clause

cases, "standards are very general," making it even more unlikely that state court decisions in

this area could be deemed "unreasonable" under AEDPA.  *See Dunlap*, 436 F.3d at 744; *see also*

*Walker v. Litscher*, 421 F.3d 549, 557 (7th Cir. 2005).  As the Seventh Circuit state in *Litscher*,

> [R]ulings on Confrontation Clause standards are very fact-specific and involve case-by-case determinations.  At the same time, and perhaps for that very reason, the Confrontation Clause standards are very general, making it difficult to call a state court ruling in this area "objectively unreasonable."

421 F.3d at 557.  Where rules are general, the state court is afforded a good deal of leeway in

reaching decisions.  The Supreme Court made this point recently in *Yarborough v. Alvarado*:

> The range of reasonable judgment can depend in part on the nature of the relevant rule.  If a legal rule is specific, the range may be narrow.  Applications of the rule may be plainly correct or incorrect. Other rules are more generally, and their meaning must emerge in application over the course of time.  Applying a general standard to a specific case can demand a substantial element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

541 U.S. 652, 664 (2004).  Because the Supreme Court's Confrontation Clause jurisprudence

provides general rules rather than narrow directives, it would be very difficult for this Court to

find the Illinois court's decision unreasonable.  Thus, even if the Court believed that the trial

court erred in excluding portions of the taped conversations between Petitioner and Najera, it

would be difficult for this Court to find such error "objectively unreasonable" in light of the wide

latitude afforded to the state courts.  Because Petitioner has failed to show that the Illinois courts

unreasonably applied Supreme Court precedent, he cannot obtain habeas corpus relief.[6]

## IV. CONCLUSION

---

[6] Because the Court finds that the Illinois courts' application of Supreme Court precedent was not unreasonable, we need not reach the harmless error prong of the habeas determination.

For the foregoing reasons, federal habeas relief is not warranted and the petition for writ of habeas corpus is respectfully DENIED.

Enter:
/s/ David H. Coar
David H. Coar
United States District Judge

**Dated:** March 31, 2009